Christopher Billesdon v. Wells Fargo Securities, LLC Thank you, Your Honor. May it please the Court. Plaintiff Christopher Billesdon worked at Wells Fargo Securities for decades, all while suffering from a paralyzed bladder and colon. He was laid off, along with over half the sales managing directors in his group, due to COVID-exacerbated cost pressures, not discrimination, and none of his three claims can support the judgment to the contrary. First, his failure to accommodate claim makes no sense. He was working from home during the entire relevant period, and his requested accommodation was, in fact, to work from home. Second- Wait, just on that, wasn't his requested accommodation to work from home when everybody else is no longer working from home? Well, yeah, Your Honor, we're not doubting that there would have been a question at some point as to whether the parties could come to an accommodation down the line, but as of late December, there was no go-back-to-work date. But there had been earlier, right? Yeah, so there was a kind of a stop-and-start sort of process. Yeah, I remember the time. There were lots of stops and starts. Yes, I mean, this was very common. I think we all remember this. There were a lot of businesses that said, we're going to try to go back to work, and then there was the Omicron variant or something else happened where then they delayed it yet again. But the key point here is, during the entirety of his time with the company, he was able to work from home. He was also reassured that he would not have to stop working from home as long as he had an outstanding accommodations request. And it just so happens, of course, that he never ended up needing an accommodation. But I think that, you know- Wasn't he told that actually his request was closed, that he would have to re-up his request once there was a return-to-work order in place? Yeah, so Wells Fargo decided that- And he didn't work from home during his entire 25 years of working there. No, that's certainly the case. You just said he worked from home during his entire period. No, well, I hope I said the entire relevant period. If not, I just misspoke. But my point here is that during the entire period in which he was requesting this, this was, in fact, the work environment that he had. So you frame this as like a merits question. Why isn't this like an Article 3 concrete injury problem? So, you know, the thing he requested, the accommodation, I take it to be to work from home. We don't think about accommodations relative to other people. It's like, what can you do? And so I guess I have a little hard time understanding what the concrete injury is on this claim. Like, help me understand what you- Well, so, Your Honor, we don't think there is any injury, of course, and we think that that's a- There's two ways that Your Honor could look at that. I mean, one is, much as the Eleventh Circuit in Batson explained, that means that this claim just doesn't exist. You can't have a claim for basically an intent to deny a future kind of hypothetical accommodation. Or you could say, I mean, we haven't made this argument, but you could say there just is no injury from an Article 3 perspective, and we certainly wouldn't, you know, object to that. I don't think necessarily you have to go there. I think you can just say this kind of a claim, it just doesn't work. The Eleventh Circuit laid that out well. Well, we can't actually do that, right? We can't sort of assume jurisdiction and just say it doesn't work, right? That's a steelcoat problem. So it seems like we have to answer the question of, was there a concrete, imminent, and particularized injury, right, such that it, like, satisfies TransUnion's test, right? There might be a congressional cause of action, but in this instance, it's hard to see what the injury is. I'm saying that I want to work from home, and I'm currently working from home, and I'm indefinitely allowed to work from home. I don't know what the real-world injury is in that context. Well, I'm not going to disagree with Your Honor on that point. My only point was- I didn't think you would. My only point was that I think these are both sort of threshold questions, whether this claim even exists at all. So- but I'm not going to say that there was an injury here that the court necessarily has jurisdiction to address. I just think even if the court says that there's at least that level of alleged injury, I don't think that this claim works. I think this court's decision in Myers reinforces the directly-on-point Batson decision in the Eleventh Circuit, where this court made clear that accommodations are about, like, the present or immediate future. We're talking about, like, right now. What do the parties have to do right now to accommodate a potential disability claim? And this is not that. I mean, this is, at best, at absolute best, a completely far-off kind of hypothetical, maybe at some point we'll get to this. But is it really maybe at some point? They had already been ordered to return to work. This man is sitting at home, not knowing what day folks are going to be asked to return to work or how long the return to work will take. He's been engaging in this interactive process for what seems, I think, from the record to be months. And rather than be told yes or no, you'll be allowed to stay home once others are required to go back, he's told your case is closed, come back to us at the relevant time. And so it's actually not indefinite because Wells Fargo didn't announce that there was an indefinite stay at home. To the contrary, Wells Fargo had called everyone back and then called it off. And I think my understanding is people did go back to work a month after he was terminated. Isn't that right? Yeah, I do think it was about a month after. But to be clear, when I said it was indefinite, what I meant is in late December when they decided to close the case, at that point there was no date for going back. They didn't have a determined here's the date where we're going back. And also to reiterate, they also made clear as long as he had an outstanding request, they were not going to require him to come back into work. I think what he's claiming here is that any arrangements that were made were provisional. I'm not sure how this spools out in my own mind, but it seems to me he's saying, well, you didn't formally accommodate me and you didn't engage in the interactive process that is necessary as a prelude to accommodation. And so he's saying that the statute, when it says accommodation, is talking about some form of assurance that this will be here as a more or less permanent matter. I mean, I think that's what he's trying to say. Well, that's what he's contending, that any accommodation here was not an accommodation. It was just a matter of happenstance. And that all the indicia of accommodation were absent. Now, what do you say in response to that? I'm not sure that's not sure whether or not that's persuasive. But what do you say in response? Because that seems to be the nub of what this gentleman is contending. Yeah, Your Honor, the text of the statute is you can't fail to make, well, the gerund form making an accommodation. So already we think that that tells you it's kind of a present tense or at least close to present tense sort of thing. That's also what this court said in Myers. So I don't think that you can basically say, well, I want this assurance that three months down the line or six months down the line, something is going to go the way that I want it to. And then when it turns out that it never actually ended up being needed, you can just point back and say, well, you didn't give me a formal piece of paper that says I would have gotten that. I mean, I think two hypotheticals just show that this can't possibly be right. One is take this very case, but imagine that he was not laid off. And then they did decide to grant him an accommodation, maybe not the exact one that he wanted. But suppose they granted him the exact one that he wanted. He could still somehow claim that they failed to accommodate him because back in December they had not formally granted him a letter at that time. That doesn't make any sense. Or imagine someone in a different circumstance asks for an accommodation for an event six months down the line. The accommodation is formally denied. They say, we're not giving you this accommodation. But then three months later, that person's entire division is laid off. I mean, there's no question. Would it be difficult for you to simply sit down with him and say, what do you need as an accommodation? Well, to be clear, Your Honor, we think that that's exactly what was happening here. I think if you look at Davis's notes and if you look at the testimony, when they decided to close the accommodation request, it was very much still in the balance what kind of accommodation might be sufficient for him and what kind of accommodation Wells Fargo could provide for him. But they closed the request. And, you know, I'm sitting here very cognizant of the fact that we're after a jury trial and a jury conclusion, and it just strikes me based on the evidence that a reasonable jury could have concluded based on the evidence that the fact that he was terminated before he needed it did constitute a refusal to make the accommodation. I mean, I think about having an employee, for example, who's deaf and says, I need an interpreter or I will need an interpreter when I have to do something in the future. And the employer, rather than saying, okay, we'll get you an interpreter when you need it, simply says, come back to us at the time when you need that interpreter. Wouldn't that be a refusal to accommodate? And isn't that exactly what happened here? Well, Your Honor, a factual and a legal response. So the factual response is I don't think any reasonable jury could come away from this saying they had absolutely denied any sort of accommodation. I think the evidence is unequivocal that they were still trying to figure out what kind of accommodation they could potentially provide when the time came. But legally speaking, there are other claims that address different problems. So Batson makes this point explicitly. So in this case... Can you make your run alone, Tom? And I'd like you to respond to what I think is your hardest line, because it seems like to me you sort of got to run the table here to get what you really want at the end of the day. With respect to the retaliation discharge claim, tell me why, given the temporal connection, which is there, as well as the evidence the jury was presented with respect to the, you know, dislike and disdain for future work from home. I get you have evidence on the other side of that, but there's some evidence the jury could find that his managers here really disliked the work from home process. Why isn't that enough for a jury to conclude that the retaliation discharge claim didn't require a JNOV? So, Your Honor, just briefly before I answer that, on the disability discharge claim, that is where the... Yeah, but I'm trying to get to this piece. No, I understand. I just want to quickly mention that we do think that if the North Carolina claim goes out, that has specific effects on its own. So I agree with you that on the federal side, we need to run the table. I get it does on the back end. Maybe if you preserve the equity argument, I get it. But I'm trying to get to this question. So, first of all, I think that on the proximity piece of this, I think there are two huge problems with the notion that this is proximate. The one is there was unrebutted, uncontested, unimpeached testimony from three different people that Bill Isden was already being considered for reduction in force by the Senate. Yeah, but they had chosen not to until he made this request, right? That's a great jury argument. Totally get it, right? But you might just think about it the other way, is that they were considering it. They decided not to until he made this request. And so then they retaliated against him. So on that point, Your Honor, I don't think anyone can seriously deny that there was a serious downturn in this group's fortunes in the late summer, early fall. I don't even take, and we can see what opposing counsel says. All right, fine. But that just says you're going to fire somebody, right? It doesn't say who you're firing. And if they fired, if they chose him out of the other options because of, but for his request, not his disability, I get that's a different issue. But because of his request, it seems like a jury could make that conclusion. But Your Honor pointed to two pieces of evidence. The first was proximate cause, or sorry, proximate temporal relation. And on that point is the unrebutted testimony is that there were three names. It was Fitzhugh, Billiston, and Abele, and that Iannuzzi pushed back on Abele. So Fitzhugh they then did add to the reduction in force. And then the only other name left at that point really is Billiston. So that's all before you're getting to the time of the supposed retaliation. But the other point But you know the first time they didn't include the plaintiff. He wasn't included. No, that's true, Your Honor. And a jury could conclude that they made a decision. That wasn't an accident. It wasn't a Scribner's error. That they made a decision to not include him. And then there's a complaint about an accommodation. And then he gets included in what might be viewed as like a little bit of a procedurally odd way. So Your Honor, I don't think it was terribly procedurally odd. But I also think even if you buy I didn't bring that up as the start, right? But we still have this sort of animosity to work from home. Well, but the so two points on that, Your Honor. I don't think it I don't think that I would deny that they didn't like the idea of working from home. But I don't see how that leads into sort of a retaliation kind of a claim. Like I do think you can infer from these notes they were not a fan of the idea of working from home. But I also think the only thing you can get out of these notes and the surrounding evidence is that they were looking for alternative solutions. And that they were still looking for alternative solutions when they ended up putting him on the reduction in force. And you think the only thing a jury could conclude, given this temporal and this dislike, is that? That seems like a I mean, that's a really like lenient version of a J&OV standard. I don't think it's a lenient version. I think you just have to actually look at the notes themselves. I think if you look at the way that Billiston is characterizing them, maybe you get a different conclusion. But what the notes what the notes show is Wells Fargo doing what it's supposed to. And I actually think it would be incredibly dangerous for this court to say that engaging in the interactive process, saying, well, we don't really love this idea, but maybe we have this other alternative idea. If that's somehow on its own, combined with, you know, temporal proximity, although for the reasons I've suggested, I don't think that's a particularly strong argument here. That's on its own enough to say. When you strip it down to its essence, why wouldn't it be like this? Among the various options that the company possessed, whether to lay off employee A as opposed to employee B or C, or whether to lay him off at all, that the request factored into that. I mean, I think it's a trickier argument to me to say that there was a failure to accommodate when he was on remote work during the entirety of his employment. But it occurs to me that the retaliation argument is a little bit less tricky and a little bit more straightforward by saying that given the temporal connection, the fact that he had a request pending really annoyed the supervisors, either because they didn't like remote work or because of whatever, but that that request sufficiently annoyed them that they took this route among two or three others that they could have pursued. And, you know, you do have a jury verdict out there. And it's hard to say that this person's request didn't factor in. You can just see people sitting around the table and say, well, we got this request out there for remote work. And, you know, that's just not a good idea. We don't like that. It's against really the company is trying to come back from COVID and do that. And then say, yeah, well, and they only needs to do the problem is an injunctive state. You really need to run the table to prevail in light of the jury verdict. You got to prevail on all of it to win. It seemed to me that you had a relatively stronger point to make with the failure to accommodate, but that it was a little difficult, a little more difficult for you to undercut the retaliation claim by saying that this request for an accommodation did not factor in at all or played no part in the company's choice of options. That's what's hard. Your Honor, my time has expired, but if I could briefly respond. So just quickly, we do think if we went on the disability discharge claim, at least the North Carolina punitive damages go away. We also have arguments on damages, but just to respond to your Honor, I do take your Honor's point that there is an argument for temporal proximity. We obviously have made our argument that we think that under the law, you can't just ignore the unrebutted testimony to the contrary. But even if you think that there's temporal proximity there and from there to some extent that is evidence in favor of retaliation, I don't think that temporal proximity alone is sufficient. And I think if you really drill down into all of the sort of plus factors that Bilston tries to provide, none of them ultimately get where he wants to go. But why isn't that a jury argument that you've just given us? I mean, yeah, I get it. I think those are really valid points to make, but how does that justify overturning the jury's verdict on this point? Because what you said is a good argument, but it's maybe a better argument before a jury than it is before us. Well, your Honor, I think the idea that temporal proximity alone cannot provide enough evidence, we cite cases in our briefs saying that that on its own is not sufficient. And so my point is just that even if you think that a jury could look at the evidence on temporal proximity and come away with the idea that, yeah, this was sort of temporally approximate, even though they were still trying to accommodate him, they still had an open process, et cetera, even though they talked about this in the summer. I can look at the fact that the request was still pending at the time that the decision to lay off was made. You know, it's not just temporal proximity. I think it's the point that the request for the accommodation was still pending when the decision, when the decision to lay off was made. And so, you know, characterizing it is purely a question of temporal proximity. I'm not sure it was, I'm not sure that's the only factor that weighs in here. Well, your Honor, that's certainly our position. But even if your Honor disagrees and thinks that maybe a jury theoretically could, you know, maybe there's enough evidence to at least get to the point. Well, not theoretically. They did. Well, sure. But the analysis, the question is first, you know, judgment is a matter of the evidence argument. And I think there, at the very least, the weight of the evidence is overwhelming. And we would point to the district court's attempt to justify not vacating the jury verdict made basically three claims. And all of them, we think, were just objectively false. Your Honor, but you do recognize you need to prevail on all of them to overturn the jury's verdict. Yeah, we, well, yes, we, to at least make a federal statement. Can I ask a follow-up on that, on that question?  So, except a hypothetical, it's purely hypothetical, that we, that this court decided to vacate the failure to accommodate and the disability discharge claims, both state and federal. But we affirm the retaliation discharge claim. And assume for a minute that we agreed with your back pay argument. Tell me what we would then do? In other words, you now have only ADA claim that is left. In general, that would be an equitable judgment to be made by a district court. You have not exactly argued, either to this court or to the district court, that the court was required to make separate findings with respect to this retaliation discharge claim? Why aren't you bound by the jury verdict on the front pay, well, and back pay piece, subject to the substantive arguments that you've made? Well, on the back pay piece, I mean, we made our arguments as soon as we could when we got a back pay damages award. But not, but not that the judge should be the one determining the ADA equitable piece. Well, and to be clear, on back pay, our argument has always been a legal argument, not the argument that this would be on the equity side of things. Now, I do think on the front pay side of things. So you agree if, in my hypothetical, where we did those things, the $4.7 million award for back pay, we would affirm as a jury's award? Well, it was $6 million, and we think it should have been, at the very least, no higher than $4.2, but. I thought it was $4.7. Whatever the reduced number that you argued, I thought it was $4.7 or $4.2, whatever it is.  Whatever that number is, we would affirm that as a jury award of roughly $4 million in back pay damages. Yeah, I mean, we would ask for the court to either order a new trial on damages or. A remitted. A remitted, but yes. But with respect to front pay, even in my hypothetical, you're not objecting to the fact that the jury was the decision maker. You're objecting to the result that was reached, and there are a number of substantive arguments, but you're not asking for a remand for the district court to determine front pay damage. Well, Your Honor, actually Bill has been specifically argued in his brief. Can you ask the question first? So are you asking for a judicial determination of equitable front pay? Yeah, so we did ask for this post-trial that it should have been a judge question. We do think that makes more sense. The reason that it was sent to the jury in the beginning is that North Carolina law, there was some lack of clarity, but it seemed like possibly this should be a jury question, and so maybe it goes to a jury. Didn't you ask specifically that the front pay argument be decided by the jury? I mean, aren't you stuck with that? Your Honor, I don't think that we are. I mean, I think that we were agreeing that the North Carolina side of things could probably be, should be decided by the jury. I don't think that we necessarily were agreeing to everything, but regardless. But you didn't ask the district court. After the jury verdict came back, it seems like to preserve this issue you would have said, hey, district court, you may consider this advisory with respect to the ADA claims, but your responsibility is to enter an equitable judgment that conforms or doesn't conform with what the jury determines. And you don't get double recovery, but you would need the district court to make those findings. You didn't ask for that. So it seems like to me that issue is like waived for us. We're sort of bound by what we've got. Well, Your Honor, my recollection of what we asked for is that the judge should have decided those claims to begin with. But I don't think we made this specific argument that you should now enter a judgment separately. Thank you, Your Honor. Thank you, Your Honor. May it please the court. Wells Fargo's appeal asked this court to overturn a unanimous jury verdict after a full trial. But under Rule 50- How long did the trial go on? It was a week. It started on a Monday, and the jury rendered a verdict around 345 on Friday. And based on the evidence that the jury heard, the full evidence during that week, a reasonable jury could reach the result this jury did based upon the record that it saw. This is by far not a no evidence case. The jury heard and saw a full record including the accommodation process, Wells Fargo's own human resources documentation, contemporary notes of that process, Wells Fargo's response to Mr. Billiston's disability-related limitations, and the late development- The accommodation he wanted during the time that he worked there. That is incorrect, Your Honor. At the time that- Is that correct? It is not correct. He had asked for- Wells Fargo had announced a return to office. He then formally asked for a concrete accommodation to be able to work from home when the employees were returned to office. And as we talked about, and as Templeton is in the record- Does it turn on that? Is that- Is your point that there was no accommodation, that accommodations are relative to what other people are getting? So if I'm seeking an accommodation that everybody else is getting, that they must separately provide it, right? I mean, we don't normally think of accommodations as relative to somebody else. What we say is, what do you get to do? And here, he was getting to work from home, and there was no end that was established for getting to work from home. And so I guess I'm- I don't understand this attempt to tie it to when other people come back. The answer is, he said he needed to be at home. He was at home. Your Honor, the difference is the Americans with Disabilities Act. He had an imminent need, and that imminent need- What was the imminent need? What was imminent? Wells Fargo kept, using the record's words, at JA 934-946, that they were- that the return to office was imminent. It was fits and starts, is what they testified to. So what happened is, in August of 2021, when he first asked for the accommodation, Wells Fargo said, everybody's back at the office. They kept moving- Do you agree that it requires it to be imminent? I mean, do you think that's the right standard? So if the return to work was imminent, so at that point in time, and I understand your suggestion that you thought it was, but if I disagreed with that premise, that there was no, at this time, in, you know, whatever it was, December, there was no scheduled return, and therefore there was no imminence, do you agree then that there's no injury? Not at all. Okay, tell me what you think the injury is. If you accept, I understand you don't, but if you accept that the return to work was not known or imminent, what would your Article III injury be? Because the managers had already rejected the request to work from home. I'll accept that, okay, and why did that injure your client? Why was that a concrete and particularized injury such that it satisfies TransUnion's standing requirement? Well, first of all, Wells Fargo has waived any arguments because they didn't make any- It's jurisdictional. You can't waive it. And second- Go to second. That wasn't this case. Again, he had- What do you mean that wasn't this case? I've asked the question. The question is, what was the injury to your client? That he was going to be forced to return to work without a solution for his bathroom needs. That there was never an indefinite- He was going to be- Okay, that's what you think the injury is, though. That's what I'm evaluating for Article III, is the risk that he might be returned to work without a solution. Well, and the jury heard, Your Honor, that it was a real risk, and it was a risk that was causing great emotional distress. How am I going to go to the bathroom when I return to work, which is imminent? It was coming around the corner. In December of 2021, at the time that they tell him- Again, what is very clear, I'd like to impress upon the Court, is along the trial theme of the case, they said, we had gone through all of the hoops to see if we can accommodate him, and he was already being accommodated, so therefore satisfied. But at appeal, they've argued, we didn't go through all those steps. Instead, we tabled that because he was working from home indefinitely. Those are two very different things as to what was happening. The tabling of- Neither of those matter to my- I'll just give you one final time, and then I'll stop. Neither of those matter to my point. What I'm trying to just make sure I understand, if they tabled it, or if they denied it outright, tell me just one more time why that was a concrete injury to your client. The concrete injury to Mr. Bilston was not having an answer to his bathroom need and knowing that he was going to be required to come to the office. So again, it wasn't as if he- How did he know he was going to be required to come to the office? Because he sort of understood that COVID was going to run its course? Well, Wells Fargo had been announcing from August of 2021 all the way through until February of 2022, monthly, their return to office dates. It is a moment in time in December, which they say in their briefs, when Omicron hit, and everybody thought, oh no, we're going to go back to everybody from home. But it was very short-lived, Your Honor. By mid-March of 2022, less than a month after they fired Mr. Bilston, they're back in the office. When did they announce that return? That return was announced, I believe, February 9th. The question is, is something a concrete injury? And let's say we can say he was accommodated, maybe not ideally accommodated, but he was accommodated during the entire period of his employment. All right, so we get to the question of whether there's an injury. And all of the Supreme Court's case law has said there has to be something concrete. It can't just be a theoretical injury. And you say, well, he was worried about what the situation would be once COVID had passed and people were to be required. But we can all speculate and worry about what may or may not happen in the future. And I'm just wondering whether that kind of concern, I mean, every single human being has worries about what the future, how the future may unfold, okay? But that doesn't necessarily make a worry about the course, the future course, concrete. It has to be something a little bit more imminent than that in order to count. And all I'm saying, hold on just a minute. I'm interested in listening to you. I have a question here, and that is, isn't the fact that he worked from home during the entirety of the period of employment, doesn't that make the ADA claim, particularly, I guess, in light of the 11th Circuit decision, which seems to be awfully close, doesn't that make it a trickier path for you than the retaliation claim? And if you prevail on the retaliation claim, is that the whole ballgame because the judgment, the jury's verdict would be upheld? May I answer all of those, Your Honor? A couple things, let me start where you ended. I'm just asking to boil it down for you. Why isn't the retaliation claim a surer path for you than the ADA claim? You might concentrate on the retaliation claim. And does the retaliation claim preserve the judgment for you, subject to the substantive arguments on back pay and front pay? So let me start and respond to that with citing to JA 1266 through 1291. Wells Fargo itself treated the need for an accommodation as imminent and as harm that would be caused to him if it was not given. Mrs. Davis, the human resources, detailed in her notes the numerous meetings that they needed under the ADA to give him a prompt response. Return to office was around the corner. And the only time that it was no longer imminent or no longer being pushed was after the decision to terminate him had been made. So all the way up until December 6th, the day that they decided to fire him, that was undisputed. They were all working towards this imminent return to office need. And those notes detailed, day by day, talking to the managers, getting their no's. Manager told, the jury saw the notes where the managers tell HR, no, we're not going to accommodate him. She says, try it for six months. They say, it's just delaying the inevitable. They say, well, let's see if we can give him two seats. She doesn't even go tell Mr. Billiston they want to give you two seats. How is your decision, how does it differ from Myers v. Hodes and also the 11th Circuit? Yes. So in Batson, Your Honor, under the 11th Circuit case, that case is very different than this case. In that case, Batson admitted that she had never been denied an accommodation. That isn't this case. Mr. Billiston, all along, never got an answer to his accommodation request before they fired him. In addition, Batson was on summary judgment, so the burden was on, the evidence was looked at in the light most favorable to the plaintiff, and the plaintiff admitted that she had not had been denied an accommodation. In addition, that's why we've cited Roberts out of the 10th Circuit. The Roberts case says that you can't just reject and wait until harm happens. You have to follow the ADA and make a timely accommodation for something that's in the near future. And there's lots of instances where people are expecting something needed in the near future, just as Judge Berner had given the example regarding a deaf employee. How about the Myers case? Well, in the Myers case, Your Honor, that case, it says no duty for an indefinite future accommodation. This wasn't indefinite. This was a return to office that was imminent at all times, actually happened, and that the only time it didn't become imminent is when they had already made the decision to fire him. So to argue that it was tabled or it wasn't imminent or he was being accommodated the entirety of the time is just not the record of the case that the jury saw. The jury saw in the notes that there was heightened scrutiny over his requests. So you're saying Myers turned on imminence and this is imminent here. Well, Myers says he had no duty for an indefinite future accommodation, and here it was definite. It was a return to office was coming. And may I, Your Honor, address your question about retaliation versus disability discharge? A key point in the record is that Mr. Billiston's disability changed over time. And if you look at that same site, Mrs. Davis's notes, the managers immediately asked, what changed? His request for an accommodation, and I thought your retaliation claim was simply that it was the request for an accommodation that factored into the discharge and that that was retaliatory. Well, the evidence for both the disability discharge and the retaliation can overlap, and there was overlapping evidence that the jury saw. The first point is that the managers, Wells Fargo claims the managers knew he had this disability. But when, in her notes, they're asking him. But I'm asking you, suppose we were to uphold you on the ground of the retaliatory discharge, okay? Would that preserve your judgment, or are you nervous about that? No, I'm not nervous about that. Your Honor, I believe that this judgment can be affirmed in multiple ways. It can be affirmed by upholding the jury's full verdict as is. It can be affirmed by using the state law claims under WDPP. It can be affirmed by a disability discharge claim stand-alone, and it can be affirmed under a retaliation claim. So there are four ways. Can I ask the last question, which is the retaliation? Hypothetically, if we only affirmed on that basis, that would eliminate the state law punitive claim, the million-dollar state law punitive argument? Is that right? Well, that's what counsel had just said. Again, we disagree with that. Again, the jury returned a verdict. Are you saying hypothetically, again, which we disagree with, that you overturned the jury's verdict on all claims except for the retaliation? Except, right. That's the hypothetical, right? I understand that that's not what you want to understand, but I'm just trying to understand what the world looks like. If that were to happen, that would mean on the disability discharge state law claim, there's a million-dollar punitive award that would go away because that claim would have been overturned. Okay.  I'm sort of following you. Okay. And then we would ask the question with respect to back pay and front pay that we have to ask regardless, whether their substantive arguments about the propriety of those is correct or not, but that would be the only question that we would then have. We would get rid of the state law claim and that punitive. The punitive on the ADA would remain. The front and back pay would remain, subject to the defendant's arguments about the size of those verdicts. Well, and obviously, Your Honor, we would disagree with that finding because the jury has enough evidence.  But in that hypothetical, again, standing here today, there wasn't a separate retaliation claim under WDPP that allowed a separate recovery for the back pay and front pay under WDPP. Whether that allows punitive damages to go, I honestly don't quite for sure know because under North Carolina state law, which Wells Fargo did not brief, there's only a cap. It's $250,000 or three times compensatory. The question would be, are those compensatories that are given under a federal claim part of the cap? But if we vacate the state law judgment, we have to vacate the entire state law judgment. I disagree with that. I don't think that you can have – I don't think that you have to have compensatory damages that you have elected. Think about an election of remedy, that you have to elect the state law damages to get punitives. You think you can get state law punitives based on an ADA claim? Well, because they could find that they didn't meet the underlying compensatory and that they did meet the punitives. It would be capped under North Carolina law in that instance at $250,000. But the argument that if the retaliatory verdict was upheld and the punitive damages, the jury had a separate line. Did they willfully violate North Carolina law? Yes or no? If so, how much in punitives? So the punitive damages were a separate claim that they were allowed to award, and those punitive damages under state statute are only capped by the amounts of the award. What I'm unclear on is whether it has to be only that you elect under WDPP in order to get punitives. I don't think that that's accurate, Your Honor. And may I address damages while I'm up here for just a minute, Your Honor? Defendants argue in back pay that there was not enough evidence to support the number that the jury rendered. That's just not accurate. It's not a single number case. The jury did not hear a single back pay number from the expert that Mr. Billiston's compensation was. You don't think he said whatever the number is? Your argument is the 4.2 number? Your expert, Mr. Moore, never said it? He did not say it. It is not in the record. There was a demonstrative table that was shown. But your argument depends on the word. Like, he didn't say the back pay is 4.2. He did not. He gave a total cumulative damages at the end of his testimony only for the $32 million inclusive of back pay and front pay. In addition to that, he testified that his numbers were very conservative. They did not include deferred comp. Let me just ask hypothetically. If we found that by testimony and reference he said the 4.2 number, does that change? Does that mean that you're limited to the 4.2? No, it doesn't. I don't believe he said that, Your Honor. That's hypothetical. I do not believe that we are limited to that number. The jury wasn't limited to that number. The jury had multiple facets of his compensation to consider. As an example, Mr. Billiston's deferred comp, which was not included in the math, was 40% of his bonus. If you just look at that number for the back pay for two years, it's $1.8 million. No one was in the jury room. We don't know that that's the math they did. But that was evidence that was given to the jury that closes the gap on the 4.2 to the $6 million. It's almost precise. Willis-Pargo takes issues with I gave in closing. Excuse me, counsel. Why would the ruling on a claim like retaliation, which speaks at a minimum to compensatory, but why are these punitive awards generally, what is the reason for upholding the punitive awards as opposed to making this purely a compensatory damages case? Because one could look at the company's conduct here and say, well, you have enough to uphold the jury verdict for whatever compensatory damages can be awarded, but I'm not sure that the company's conduct in its entirety merited a punitive award. So is it possible to say that this is a company that wasn't perfect, but it didn't reach the level of egregiousness that was necessary for a punitive verdict? Your Honor, Willis-Pargo never raised that on appeal. So there's a rule 28 issue. It was waived. It wasn't raised on appeal at all. And the jury had enough evidence to find punitive damages. The jury heard evidence that at the highest levels of the bank were involved in this decision to terminate Mr. Billiston after he had disclosed his changing disability needs and his need for an accommodation. And so the jury heard an abundance of evidence of willful, reckless conduct in which that punitives were awarded both under the Americans with Disabilities Act and under state law. Under state law, it's a clear and convincing standard. Your view of it is because the whole question of punitives wasn't raised that we're bound to the jury's verdict on that point. Yes, Your Honor. The same argument is true too on front pay. There's an argument on front pay. Willis-Pargo has raised as a zero. If you change jobs after you have been discriminated against and fired, then you get zero dollars on front pay. That is not the law. And, in fact, they changed their theory. At trial, they argued mitigation reduced front pay. At appeal, they're arguing cutoff because he changed jobs. But I would point you to JA1357, 1360, and 1367. It is important to note that Willis-Pargo received double mitigation because Mr. Billiston changed jobs. He went from Breen at $250,000 a year to Academy, and he was credited in the mitigation chart of $500,000, if you compare 1360 to 1367, in the numbers that were provided by Dr. Moore in the demonstrative. In addition to that, the jury cut the front pay in half. The ask at closing was roughly $28 million, and the jury showed restraint and took in the evidence and issued a $14 million. And, Judge Richardson, I think there's-  Well, Your Honor- $14 million is restraint? Well, I'm glad you raised that, Judge Wilkinson. Mr. Billiston brought into the bank over $60 million a year in sales, and he had record sales years the last two years that he was there. We're talking about highly compensated individuals. They all made $400,000 base, and the delta between their pay was the bonus. His pay was- But why would they want to discharge somebody who was that productive? Well, we asked the jury- The jury was asking themselves the same question, Your Honor, because that is exactly one of the theories that the jury heard at trial, which is, here is this top producing having two record years- I know you were disconvinced whether somebody had a disability or not would be- I'm wondering whether that doesn't cut against you, because it seems irrelevant. If somebody's bringing in $60 million in terms of revenue a year, or whatever he's doing- And logically- You would want to keep that individual on- Logically, Your Honor- Regardless. So, why did they- I mean, just- Yeah. I don't understand if this individual was as productive as you just told me he was, why would they want to discharge him? Well, it's in the record. In Mrs. Davis' notes, Joanne Doyle- I'm sorry, Jennifer Doyle, when she was confronted by legal and HR saying, you should try this accommodation for three months. Let's see if it works. She says, well, I have to weigh which is the greater risk, letting him work from home or not returning to the office. They were so adamant at the time to get everybody back into the office. They were willing to let go of somebody who was performing at the level Mr. Billiston was, just to avoid allowing him to have an accommodation to work from home. And the jury heard all that. The jury heard both sides. They heard Wells Fargo's story about how he was selected for the RIF. They heard the story about- They knew about his disability all along. They also heard that the disability changed, the need changed, HR said he should be accommodated, and they rebut even their own HR person. The standards under Rule 50 and Rule 59 can be met by looking at Mrs. Davis' notes and the RIF sequence, the sequence in which they opened up a closed RIF, put him in. The other very compelling email is once they found out they got away with it, once they found out that he was going to be gone by end of February before return to office, they were high-fiving each other, saying, there you go, and 10 days later, that was December 21st, 10 days later, they go to Mrs. Davis, HR, and say, tell him he's already being accommodated, and if and when he ever comes back to the office, he can try again. All of that, the jury heard, the decision had already been made, Your Honor. Absolutely. Thank you so much. Thank you. We ask that the court affirm the jury's verdict. Thank you. Thank you, Your Honor. Many points, I'll try to get to them briefly. On the punitive point, you didn't raise that. No, our argument for why the North Carolina Punitive Damages Award goes away is what Judge Richardson's argument was, or hypothetical. But that's not before us. No, no, it absolutely is. If we win on the disability discharge claims, the punitive claim has to go away. I don't see how you can have a punitive damages award under North Carolina state law when there is no North Carolina state judgment. I don't see how that could possibly work. On accommodation, Batson is exactly on point. In Batson, the employee was specifically told her accommodation requests were denied. It's actually our case, which doesn't have, at the very least, an express denial. But even if you want to say there was a denial, Batson did as well. I don't think there's any difference there. You don't disagree with Roberts as a principle, right, that if you're going to have to travel in two days, that that is sufficiently imminent. No, we have not disagreed with the idea that if it's today or tomorrow, basically. And to be clear, in Roberts, it wasn't even just that he had to travel in two days. It was that he had to make his arrangements for the nursing assistant immediately because, you know, you can't just do that as you go to the airport, as it were. On back pay, I find the argument that they never told a particular number to the jury baffling. On the one hand, closing arguments, this is specifically the number that they pointed to. The demonstrative from the report specifically points to this number. It shows the calculation. And if the argument is, well, actually, we never told them anything about back pay, that just means it's even more speculative. But there is no evidence for it. So your point is when he says, what is table three or what are the precise languages? He says, oh, this is the back pay number, right? The fact that he didn't use the words $4,223,762 doesn't matter because by reference he is. Yes, that can't be dispositive. And just to be clear, this was the evidence they put on about back pay. So if the expert came on and didn't say anything, which seems to be their argument at this point, well, then they just have no evidence on back pay. So that doesn't help them. And then just lastly on the two points on discharge and then retaliation. There hasn't been a ton of discussion about discharge. I think the Kelly case pretty much resolves that for us. But then on retaliation, there are a lot of things, and I think Counsel for Billiston, you know, it sounds a lot different than if you actually look at the evidence. And so I would just encourage the court, for instance, look at this question in the notes of how Doyle responded about the risks. This was not, oh, I am so worried about getting people back into the office because I think it's, you know. It was FINRA. She was concerned about regulations requiring potentially people to be in the office. That's a totally reasonable thing to be concerned about. And you cannot draw the inference from that, that therefore she decided to retaliate. Similarly, this supposed high-fiving e-mail, there is no high-fiving e-mail. There's an e-mail where someone says, once the RAF process was done, there you go. I mean, if that is sufficient, if that is sufficient, I think there's going to be almost no case where there isn't sufficient evidence to show this. Wasn't there a Wells Fargo manager that testified that he couldn't recall a single time when a decision to rip someone from Wells Fargo from start to finish was completed in two weeks? Wasn't it an unusual process? I don't think it was an unusual process. Wasn't there testimony from a manager? Can I ask my question? Yes. Oh, sorry. I thought you were finished. The testimony from the manager was that this was an unusual process and that they had never seen a RIF carried out in such short order. Is that correct? Not quite, Your Honor. It's, what I would say is- At J.A. 976, that's not what the manager testified? No, what the manager testified to was, the question was, this was Robinette who had also testified that it was normal to add people to RIFs, et cetera. It was that he had never seen someone chosen and ended up being done within two weeks. But that's not, I don't think that's the same thing, and I think it was pretty clear from the context that he was, that Billson was not just chosen two weeks before. The point was he had already been in the, you know, in the hopper, as it were, from the summer. So I think that that is what he was, you know, that the question was not, have you ever seen a situation like this before, and then he said no. The question was an abstract question, not specifically about this particular circumstance, and he had already testified that this was an ordinary, there was nothing unusual about adding someone to a business case after it had already been done. The last point that I'll make, Your Honor, with 12 seconds left is just, even if you disagree with us on retaliation in terms of no evidence from which a jury could draw, at the very least, we think the weight of the evidence arguments are strong, and we think that the district court abused its discretion in saying things that were just simply untrue about the notes about witness testimony in rejecting that argument. So for those reasons, we would ask the court to reverse. Thank you. We'll come down and we will recounsel and proceed directly into the next case.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Nicole G. Berner